SANFORD MANUFACTURING COMPANY, Appellee and Cross-Appellant, v. WESTERN MUTUAL FIRE INSURANCE COMPANY, Appellant and Cross-Appellee.

No. 45175.

284

October 22, 1940.

Kern & Faville, for appellant and cross-appellee.

Stipp, Perry, Bannister & Starzinger, for appellee and cross-appellant.

STIGER, J.—Motor Freight Terminal is a trade name used by Fred A. Hermann in the operation of his business as a warehouseman for the storage of shipments transported and to be transported by motor truck lines. Hermann purchased the two policies in question from the defendant and filed them with the board of railroad commissioners pursuant to certain rules and regulations of the commission. A certificate of compliance with the rules and regulations of the commission governing the operation of motor carriers and motor freight terminals was issued to Hermann, such certificate being, under the regulations, a prerequisite to the right to carry on his business as a warehouseman.

As one of the defenses interposed by defendant is that the commission did not have authority to promulgate the said rules and regulations, or, granting such authority, that the delegation of such power by the legislature to the commission violated section 1 of Article III of the Constitution of the State of Iowa, it is necessary to set out some of the proceedings of the commission and the rule material to this case.

In October 1933, the board of railroad commissioners made an order named "Order For Investigation" which states:

"It appears there is now no assurance that the motor freight terminals are responsible; that adequate protection is provided against the loss of or damage to property; that charges are fair and reasonable; and that the terminals are otherwise managed and operated in a manner best suited to the interests of the public and the carriers. It also appears that the maintenance of separate terminals sometimes causes delay in the movement of interline shipments, is expensive to the carrier and misleading and bewildering to the shipping public.

"Now, therefore, it is Ordered that freight motor carriers and other parties interested appear before the commission at its office in Des Moines, at ten o'clock A. M., on the 8th day of November, 1933, to show:

"1. Cause why freight motor carriers should not receive and discharge freight at only such terminals as may have complied with reasonable rules and regulations approved by the Commission.

"2. Cause why the Commission should not, after hearing, determine the terminal facilities best suited to the common good of the shippers and the carriers and restrict the operation of the motor carriers accordingly.

"3. Cause why terminals used by freight motor carriers should not be governed by rules and regulations as follows: * * *"

Then follow the proposed rules and regulations.

On April 11, 1934, the board, pursuant to the investigation and a hearing, rendered its decision and order which included the following finding:

"It is apparent that the establishment of separate terminals, either by individuals or groups, without regard to the

public and other carriers is unnecessary, economically unwise, inconvenient and confusing to all concerned; further, that the uncertainty, dissension usually following with possibility of irresponsible terminal management, is anything but conducive to the development of a substantial reliable service by motor carrier.

"It is also apparent that the interests of all concerned demands some assurance that the motor freight terminals are responsible; that adequate protection is provided against the loss of or damage to property;" etc.

The decision then ordered that effective May 15, 1934, "the intrastate freight motor carriers shall receive and discharge shipments at only such terminals as may hold a Certificate of Compliance with the rules and regulations outlined as follows * * *:" (Rules and regulations follow.)

The rule material to this case is rule 58, the first paragraph of which reads:

"Rule 58. Insurance Requirements. Terminal operators shall at all times have in effect and on file with the Commission an insurance policy, policies or a surety bond in form to be approved by the Commission, issued by some insurance carrier or bonding company authorized to do business in this state, *covering the legal liability of the terminal operator* for loss of or damage to property in the possession or custody of the terminal operator, except property of the terminal operator, such policy to be in such amount as the Commission may deem necessary to protect the interests of the public." (Italics supplied.)

The minimum amount of the bond or insurance required was $5,000.

Hermann filed insurance policies with the commission and on July 17, 1934, a certificate of compliance was issued to him stating he had complied with the rules and regulations of the commission governing the operation of motor freight terminals used by motor freight carriers.

The policies filed with the commission when Hermann obtained his certificate of compliance in 1934, which were not issued by defendant, being about to expire, he secured from

defendant the two policies in question in 1935, one being in the sum of $3,000 and one for $2,000. They were identical except as to amounts. There was attached to each policy the following endorsement:

"On merchandise of all kinds, property of assured and for which assured *may be legally liable* while contained in the one story, composition roof, frame building, located at 400 S. W. 5th Street or within 50 feet (50') thereof, occupied as Truck Depot, Des Moines, Iowa." (Italics supplied.)

The policies were filed with the commission. On July 14, 1936, plaintiff, Sanford Manufacturing Company, shipped by motor truck 203 boxes of ink consigned to the Motor Freight Terminal at Des Moines. The shipment was unloaded at the terminal on the same day. On July 15, 1936, the terminal and entire shipment of ink were destroyed by fire.

Plaintiff alleged in count one of its petition that Hermann was negligent in the performance of his duties as a warehouseman or bailee and sought recovery on the policies on the theory that they insured Hermann's legal liability. Count two is based on the theory that the policies insured the merchandise of plaintiff (the shipment of ink) while in storage in the terminal.

The trial court dismissed count one on its own motion. Defendant pleaded to count two that it attached the endorsement to the policies, which is set out above, in order to insure the legal liability of Fred A. Hermann as required by rule 58 of the regulations and pursuant to the application of Hermann for such policies; that the policies were issued in order to renew policies of insurance filed by Hermann with the commission when he received his certificate of compliance and which were about to expire; that unless the said Hermann procured such new policies of insurance as required by the rules and regulations, he could not continue in his business of operating the motor freight terminal; that defendant attached said endorsement for the sole purpose of complying with rule 58; that said policies only insure the legal liability of Hermann and therefore plaintiff's action is premature because it has not first obtained a judgment against Hermann as the owner of the terminal for loss sustained growing out of the fire.

Defendant further pleaded that the commission did not have statutory authority to promulgate rules and regulations governing motor freight terminals; that, granting such authority, the legislature was without power to delegate to the commission the power to regulate motor freight terminals, such attempted delegation being in violation of section 1, Article III of the Constitution of the State of Iowa.

Plaintiff's motion for directed verdict on count 2 was sustained on the ground that the policies furnished direct coverage to the plaintiff upon its merchandise while contained in the warehouse and while in the custody of Hermann as warehouseman or bailee.

I. One of the defenses to the action is that the commission did not have statutory authority to regulate motor freight terminals and that the rules and regulations were a nullity and void; that its only authority was to regulate motor carriers; that if the commission did have statutory authority to regulate the terminals, the legislature was without power to delegate to the board of railroad commissioners the authority to enact any laws or adopt any rules and regulations for the governing of motor freight terminals, such power resting exclusively in the legislature, the delegation of such power being unconstitutional and void. We are not in accord with this proposition.

Section 5105-a2, 1935 Code [5100.02, Code, 1939], reads in part:

"5105-a2. Special powers of commission. The commission is hereby vested with power and authority, and it shall be its duty to: * * *

"6. Supervise and regulate motor carriers in all other matters affecting the relationship between such carriers and the traveling and shipping public."

Section 5105-a3, 1935 Code [5100.03, Code, 1939], reads:

"5105-a3. General powers. The commission shall also have power and authority by general order or otherwise to prescribe rules and regulations applicable to any and all motor carriers. * * *"

Section 5105-a4, 1935 Code [5100.04, Code, 1939], is as follows:

"5105-a4. Statutes applicable. All control, power, and authority over railroads and railroad companies now vested in the commission, insofar as the same is applicable, are hereby specifically extended to include motor carriers."

Chapter 368, 1935 Code, vests in the commission general supervision over railroads and motor carriers; the duty to inspect the manner of operation and management of railroads with regard to public safety and convenience; to prescribe a change in the mode of operating railroads when in its judgment such change is reasonable and expedient in order to promote the security, convenience and accommodation of the public. See sections 7874, 7875 and 7877, chapter 368.

The commission has authority to regulate motor carriers in all matters affecting the relationship between such carriers and the shipping public. It may inspect the manner of operation of motor carriers with regard to public safety and convenience and prescribe reasonable modes of operation in order to promote the security, convenience and accommodation of the public. The manner of operation of terminals and the responsibility of its operator definitely and materially affects the relationship of carriers to the shipping public especially as to its convenience and the security of its property.

The commission found that terminals, as operated, were economically unwise, inconvenient, confusing to the carriers and shippers; that their method of operation was not conducive to the development of a reliable service to the public by the motor carriers and that adequate insurance against loss to shippers was not provided. The decision of the commission stated that from and after May 15, 1934, motor carriers must receive and discharge shipments only at terminals holding a certificate of compliance with the regulations, and required an insurance policy or bond for the protection of shippers.

A motor freight terminal is an indispensable part of the transportation of freight by motor trucks. It appears from the record that some carriers provide their own terminals. Motor freight terminals, whether operated by motor carriers or other persons, should be and are under the said statutes subject to regulations by the commission. The record clearly shows that the manner of operating a motor terminal affects the rela-

tionship between carriers and the shipping public and the rules and regulations tended to promote the convenience of the shipping public and the security of its property.

We hold the commission has statutory power to regulate motor freight terminals.

We cannot agree with defendant's proposition that the delegation of authority to the commission to enact rules and regulations governing the operation of motor freight terminals violated section 1, Article III of the Constitution of the State of Iowa which divides the powers of government into three separate departments and prohibits the encroachment of one department on the functions of the other departments.

In State v. Van Trump, 224 Iowa 504, 506, 275 N. W. 569, 570, the court said:

"The legislature may not delegate its purely legislative power. The courts thruout the land have held this. Nevertheless, it has been recognized from the very earliest times that this does not prevent the legislature from invoking the aid of other governmental departments in effectuating its policies. This court has endeavored, within constitutional limits, to pursue a 'common sense' policy in determining the extent to which delegation may be permitted, and to give due consideration to the necessities of governmental coordination and the practical difficulty of adapting legislation to complex conditions involving a host of detail."

Utilities, in the exercise of their functions, are subject to control by the state. It is thoroughly established that the state may, under its police powers, delegate to an administrative commission the power to regulate utilities to the extent necessary to protect the public interest and the power to make administrative orders. The regulations under consideration were reasonable and tended to promote the public interest and to protect the property of shippers.

II. Defendant further contends that the endorsement only insured Hermann's legal liability; that the action is premature; that before plaintiff can recover on the policy it must establish his legal liability either by a judgment in court or by proof of a contract under which legal liability was assumed by

Hermann. Plaintiff's view of the endorsement is that it insures the merchandise of plaintiff which was destroyed in the fire. We agree with defendant's interpretation of the policies when read in conjunction with rule 58.

If the endorsement were to be construed without reference to rule 58, we would agree with plaintiff's contention that it insured its merchandise. The policies insured Hermann against loss by fire or windstorm to the "following described property." The property insured is described in the endorsement as "$3,-000 on merchandise of all kinds." The merchandise insured is then restrictively and particularly described as "property of assured and for which assured may be legally liable while contained", etc. Hermann received the property as a warehouseman or bailee and his liability or legal responsibility for the property was the duty owed by a warehouseman to a bailor.

In our opinion, the ink was merchandise "for which assured may be legally liable" and was covered by the insurance policies.

The following cases tend to support our construction of the policies:

In Home Insurance Company v. Baltimore Warehouse Company, 93 U. S. 527, 542, 543, 23 L. Ed. 868, the insured was covered against damage by fire on " 'merchandise, their own or held by them in trust, or in which they have an interest or liability, contained in' " a certain warehouse. The court said:

"The subject was merchandise stored or contained in a warehouse. It was not merely an interest in that merchandise. The merchandise of the warehouse company, owned by them, was covered, if any they had. So was any merchandise in the warehouse in which they had an interest or liability. * * *

"The words 'merchandise held in trust' aptly describe the property of the depositors. The warehouse company held merchandise in trust for their customers, not, it is true, as technical trustees, but as trustees in the sense that the goods had been entrusted to them. They were not empowered by their charter to hold property under technical trusts cognizable only in equity. Hence, when they sought insurance of merchandise held by them in trust, it must have been intended of such as they held in trust,—in a mercantile sense, goods en-

trusted to them by the legal owners. That such is the meaning of the words as used in the policy we cannot doubt."

In Home Insurance Company v. Peoria & P. U. Ry. Co., 178 Ill. 64, 67, 52 N. E. 862, the coverage was "$50,000 on freight cars of every description, the property of other roads, firms, individuals or corporations, for which the assured are or may be liable, while on the line of their road." The opinion states:

"It was * * * the intention of the insurer to insure * * * only such cars belonging to such 'other roads, firms, individuals, or corporations' on appellee's line of road as assured had such control of or such connection with as that a liability might accrue against such appellee company to account for such cars to the owners thereof. The phrase is properly construed to be descriptive of the cars to be insured. * * *

"Nor is the right of recovery limited to such cars as it should be made to appear by evidence the appellee company was absolutely legally liable to account and pay for to the owners thereof. The proper construction of the policy in this respect is, that all freight cars consumed by fire while on the line of the appellee's road and in its care and custody, with respect to which it had some duty to perform of such nature it might be charged with legal liability to account to the owners therefor or to be subjected to claims and demands to so account, and to possible litigation growing out of such claims and demands, were protected by the policy." See American Eagle Fire Insurance Co. v. Gayle (1939) 108 F. 2d 116; Pacific Fire Insurance Co. v. Murdoch Cotton Co. (1936), Ark., 99 S. W. 2d 233.

Defendant relies on the case of Orient Insurance Co. v. Skellet Co., Minn., 28 F. 2d 968. The opinion in the Orient Insurance Company case cites Minneapolis & St. P. & S. S. M. Ry. Co. v. Home Insurance Co., 55 Minn. 236, 56 N. W. 815, 22 L. R. A. 390; Washburn-Crosby Co. v. Home Insurance Co., 199 Mass. 463, 85 N. E. 592; Millers' Mutual Fire Insurance Assn. v. Warroad Potato Growers Assn., Minn., 94 F. 2d 741. In our opinion these cases do not sustain the decision in the Orient Insurance Company case which is irreconcilable with Home Insurance Co.

v. Baltimore Warehouse Co., 93 U. S. 527, 23 L. Ed. 868, and other cases above referred to as sustaining our conclusion.

However, rule 58 requires terminal operators to at all times have on file with the commission a surety bond or insurance policy in a form approved by the commission governing the *legal liability* of the terminal operators. The certificate of compliance issued to Hermann in 1934 stated he had complied with the rules and regulations of the commission governing the operation of motor carriers and motor freight terminals. Hermann testified that he filed the original policies with the commission pursuant to rule 58 and then received his certificate of compliance. We must assume the original policies insured the legal liability of Hermann as required by rule 58. He further testified that he requested new policies to be issued by defendant to take the place of original policies which were about to expire.

The commission had authority from the state to regulate terminal operators. The commission, through rule 58, prescribed the kind of bond or insurance policy that must be filed by an operator as a condition precedent to his right to carry on his business as a terminal operator. The rule required that the legal liability of the operator be covered. Hermann filed the policies with the commission for the purpose of complying with rule 58 and they were accepted by the commission as being in compliance with the rules. We see no reason why the liability of an insured under a bond or policy issued under rule 58 should not be the same as if issued under like provisions contained in an enactment of the legislature. This court has repeatedly held that the liability under a statutory bond is measured and defined by the statute if it is clear that the intention is to comply with the statute. The bond or policy must be construed in the light of the statute or regulation requiring it. "It is the statute that grants, measures and limits the remedy of the plaintiff on the bond. Such a bond is not elastic." Queal Lumber Co. v. Anderson, 211 Iowa 210, 229 N. W. 707; Schisel v. Marvill, 198 Iowa 725, 197 N. W. 662.

We are satisfied that the insured, the insurer and the commission intended the bond to comply with rule 58 and that it was filed and accepted as a compliance therewith to enable Hermann

to continue to carry on his business of terminal operator and it must be construed in the light of the rule.

As the policies indemnified against the legal liability of Hermann, the trial court erred in directing a verdict against defendant on count 2 of the petition. The court should have sustained defendant's motion for a directed verdict as to count 2.

III. When the trial court sustained plaintiff's motion for directed verdict on count 2, the trial court, on its own motion, dismissed count 1 of plaintiff's petition ''for the reason that all of the relief prayed for in Count 1 of said petition is contained in Count 2, and the court having directed a verdict in favor of the plaintiff and against the defendant on Count 2 there would be nothing to submit on Count 1.'' Plaintiff appealed from the ruling dismissing count 1.

Plaintiff states in argument that ''the sole purpose of the cross-appeal is to preserve cross-appellant's rights to proceed under count one if the supreme court should reverse the trial court.''

Defendant urges that when plaintiff moved for directed verdict on count 2 of the petition at the close of all the evidence it elected its remedy, waived or abandoned its remedy under count 1 and is barred from a recovery upon count 1, and ''if the appellee is unable to sustain the judgment which it procured on the second count of its petition it is not entitled to a reversal of this case so that it may go back and try its action over again upon the first count of its petition.''

We are of the opinion that the motion to direct a verdict on count 2 did not amount to a final and decisive abandonment of count 1.

The trial court refused to sustain defendant's motion for a directed verdict on count 1 and did not dismiss this count on its merits. So far as shown by the record if plaintiff's motion for directed verdict on count 2 had been overruled, both remedies would have remained available to it. Reversed on both appeals.—Reversed.

HALE, MILLER, HAMILTON, and BLISS, JJ., concur.

RICHARDS, C. J., and MITCHELL, J., dissent.

OLIVER, J., dissents to division II of this opinion.