Arthur L. Benschoter et al., Appellees, v. Kathryn Hakes, Appellant.

No. 46118.

MARCH 16, 1943.

Hutchison & Hutchison, of Algona, and Carl J. Stephens and Ben C. Buckingham, both of Des Moines, for appellant.

Linnan & Lynch, of Algona, for appellees.

MULRONEY, J.—Plaintiffs' petition in a quieting-title action alleged that they were the owners of 154 acres of farm land in which the defendant claimed some interest by virtue of a lease. The lease, attached to the petition, showed that the Lincoln Joint Stock Land Bank of Lincoln, Nebraska, had, on September 26, 1940, leased the land to defendant until February 28, 1942. The plaintiffs alleged that the defendant claimed an interest over and above her right to possession until the expiration date of said lease.

The defendant's answer admitted the allegations of the petition and alleged her right of tenancy until March 1, 1943, by virtue of a failure to give her notice of the termination of the lease on or before November 1, 1941, as provided in section 10161 of the 1939 Code of Iowa.

Plaintiffs moved to dismiss the answer on the ground that section 10161 has no application to the facts as alleged in plaintiffs' petition and, if said section attempts to extend the termination date of the written lease beyond the date fixed therein, then the statute is unconstitutional as violative of sections 1, 9, 21, and 24 of Article I of the Constitution of Iowa and section 1 of the Fourteenth Amendment and the Fifth Amendment to the Constitution of the United States.

The trial court sustained the motion and, upon defendant's

election to stand on the pleading, entered judgment in favor of plaintiffs.

■ I. The first proposition argued by counsel for appellees is that section 10161 of the 1939 Code of Iowa has no application where there is a written lease for a definite period; that, properly construed, this section only applies to tenancies at will and not to tenancies created by a lease for a fixed term.

In support of their argument, counsel for appellees trace the legislative history of section 10161, Code of 1939. This section provides as follows:

''Agreement for termination. Where an agreement is made fixing the time of the termination of the tenancy, whether in writing or not, it shall cease at the time agreed upon, without notice. In the case of farm tenants, except mere croppers, occupying and cultivating an acreage of forty acres or more, the tenancy shall continue for the following crop year upon the same terms and conditions as the original lease unless written notice for termination is given by either party to the other not later than November 1, whereupon the tenancy shall terminate March 1 following; provided further, the tenancy shall not continue because of absence of notice in case there be default in the performance of the existing rental agreement.''

The second sentence in the above section is the amendment of chapter 235, Acts of the Forty-eighth General Assembly. The first sentence is the way the section read prior to the amendment. The history of this law prior to the amendment shows that section 1209 of the Code of 1851 provided for the notice necessary for the termination of a tenancy at will. The Seventh General Assembly repealed section 1209, Code of 1851, and substituted therefor an act which took effect July 4, 1858, which provided as follows:

''Section 2218. (1.) [R. 1860] Be it enacted by the General Assembly of the State of Iowa, That section 1209, chapter 78 of the code be so far amended as to read as follows: Thirty days' notice in writing is necessary to be given by either party, before he or she can terminate a tenancy at will; but when in any case rent is reserved, payable at intervals of less than thirty days,

the length of notice need not be greater than such interval between the days of payment. In case of tenants occupying and cultivating farms, the notice must fix the termination of the tenancy, to take place on the first day of March: provided, that where an express agreement is made, whether the same has been reduced to writing or not, the tenancy shall cease at the time agreed upon, without notice."

Thereafter, in the Codes of 1873 and 1897 and in the Compiled Code of 1919, the provision for the termination of the tenancy without notice, where there is an agreement for termination, appeared in substantially the same language in the statutes providing generally for notice for termination of tenancies at will. The Fortieth General Assembly passed an act to "amend, revise, and codify" the entire chapter [5, Title XXIII] entitled "Landlord and Tenant" as it appeared in the Compiled Code of 1919. (Acts of the Fortieth General Assembly, chapter 238.) This act took the provision for termination without notice, where there was such an agreement, from the body of the general statute as it appeared in the Compiled Code, and set it forth as a separate provision, or section 6, which reads as follows:

"Sec. 6. Agreement for termination—effect. Where an agreement is made fixing the time of the termination of the tenancy, whether in writing or not, it shall cease at the time agreed upon, without notice."

Thereafter, in the Codes of 1924, 1927, 1931, and 1935, this law, eliminating the necessity for notice to terminate a tenancy where there was an agreement for such termination, appears as a separate law, being section 10161 in all of said Codes.

This is the legislative history down to the amendment of chapter 235, Acts of the Forty-eighth General Assembly. Counsel argues that this history shows conclusively that section 10161 as it appeared in the Code of 1935 and prior Codes applied only to termination of tenancies at will. From this conclusion counsel argues that the amendment only provides for the notice where the law before amendment eliminated the necessity of notices, namely, tenancies at will with an agreement for the termination date. Counsel cites the case of Jones v. Mills County, 224 Iowa

1375, 279 N. W. 96; Dennis v. Independent Sch. Dist., 166 Iowa 744, 750, 148 N. W. 1007, 1009, and several other cases announcing the rule which is stated in the last-cited case to be as follows:

"It is a rule of construction that changes made by a revision of the statutes will not be construed as altering the law, unless it is clear that such was the intention, and, if the revised statute is ambiguous or susceptible of two constructions, reference may be had to prior statutes for the purpose of ascertaining the intent of the Legislature."

We agree with this rule. It is significant here, however, that the division into a separate section was done by a specific act of the Fortieth General Assembly. The cases cited by counsel, where the separation was made by Code commissioners or Code editors, therefore do not apply. Is this statute, section 10161 of the 1935 Code, which stems from the specific act of the Fortieth General Assembly (section 6, chapter 238, Acts of the Fortieth General Assembly), ambiguous or susceptible of two constructions? We think not. It is clear and definite.

The argument that this section only applied to tenancies at will is weakened by an analysis of the effect of such a limited application. The law deals with agreements for termination of tenancies. A tenancy at will negatives any such agreement for termination. A tenancy at will with an agreement for a termination date is a paradox. If there is an agreement for a termination of the tenancy, then it is a tenancy for a term and not a tenancy at will.

But whatever doubts exist as to the scope of the application of section 10161, as it appeared before the amendment in the 1935 Code, they are all cleared up by the passage of chapter 235, Acts of the Forty-eighth General Assembly. This amendment was Senate File 203 in the Forty-eighth General Assembly and it was entitled an act to amend section 10161, Code of 1935 "relating to the termination of *agricultural leases.*" (Italics ours.) Here is a legislative interpretation of section 10161 as it stood in the Code of 1935. The legislature is now providing for notices that must be given to terminate "agricultural leases" and it directs its amendment to the very statute that provides for no

notice where there is an agreement for the termination date. It seems clear that, by this amendment, the legislature intended to include term leases. The effect is to leave the law allowing termination without notice applicable to urban leases and all leases other than farm leases, but in the case of farm leases, except those conveying cropper rights and those conveying less than 40 acres, the notice by November 1st must be given.

Additional proof of the legislature's intent not to confine the operation of this statute to tenancies at will is furnished by the record of the introduction of an amendment to that effect. This amendment, as shown by the senate journal of the Forty-eighth General Assembly, provided only for notice to terminate tenancies at will. The amendment was not adopted. The construction placed upon section 10161 as it stood in the 1935 Code at the time of the amendment is controlling. It is the amendment of chapter 235, Acts of the Forty-eighth General Assembly, that provides for the notice that appellees did not give. If the Forty-eighth General Assembly gave section 10161, as it appeared in the 1935 Code, its apparent interpretation, without reference to its legislative history, and proceeded to amend it, then it is the duty of this court to interpret the statute as a whole and we are concerned with the legislative intent of the Forty-eighth General Assembly. The applicable rule is stated by the Supreme Court of the United States in the case of the United States v. Freeman, 3 How. (U. S.) 556, 564, 11 L. Ed. 724, 728:

"If a thing contained in a subsequent statute be within the reason of a former statute, it shall be taken to be within the meaning of that statute; Ld. Raym., 1028; and if it can be gathered from a subsequent statute *in pari materia,* what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute."

The rule is stated in 59 C. J. 1096, section 647, as follows:

"An amended act is ordinarily to be construed as if the original statute had been repealed, and a new and independent act in the amended form had been adopted in its stead; * * *."

We think it is proper for us to examine the legislative course of this amendment of chapter 235, or Senate File 203, as it proceeded through the Forty-eighth General Assembly. The senate journal of this general assembly sets forth the governor's message to the legislature. In this message the governor told the legislature that the report and recommendations of the Farm Tenancy Committee of the Iowa State Planning Board would be submitted to the legislature. Among the specific recommendations of the Farm Tenancy Committee we find the following:

"1. It is recommended that a special sub-committee on Farm Tenure be appointed from the Agricultural Committee of each House of the 48th General Assembly for a careful study of this most important problem. * * *

"6. Legislation should be enacted to provide for:

"(a) the automatic continuation from year to year of all agricultural leases until notice for termination is served by either party not later than six months before the expiration date of the lease, * * *."

Pursuant to the first recommendation noted above, a special committee on farm tenancy was created by the Forty-eighth General Assembly. This special committee introduced Senate File 203 as a committee bill. It is obvious that Senate File 203 was introduced pursuant to the recommendation noted above. The Farm Tenancy Committee of the Iowa State Planning Board, in this same report, supported its recommendations by a statement of the results of a survey which showed the seriousness of the Iowa farm-tenancy problem. This survey showed a steady increase of tenant-operated farms from twenty-four per cent in 1880 to fifty per cent in 1935. It showed that in 1900 there was only one Iowa county where half the farms were tenant-operated, while in 1935, 57 counties had half or more farms rented. It showed that in 1937, fifty-eight per cent of the farm area of Iowa was under lease. This survey also revealed that thirty-four per cent of all tenants had been on their farms for less than two years; that such unstable conditions necessarily lead to severe soil exploitation, to neglect of

farm improvements, to tremendous losses involved in frequent moving, and to reduced farm incomes. This survey was conducted by questionnaire method and the report also showed that public hearings had been held in every county in Iowa.

In view of the above, we are thoroughly convinced that the legislative intent of the Forty-eighth General Assembly at the time of the enactment of chapter 235 was that farm leases for a definite term could be terminated only by the November 1st notice, and failure to give the notice worked a renewal of the lease for one year commencing the next March 1st.

 II. This brings us to a consideration of the constitutional issues. The most serious assault launched against the law by counsel for appellees is that it violates rights guaranteed to appellees by sections 1 and 9 of Article I of the Constitution of Iowa, and it deprives appellees of their property without due process of law within the prohibition contained in the due-process clause of the Fourteenth Amendment to the Constitution of the United States.

This legislation is not vulnerable to the constitutional attack here made if it can be said to be a reasonable exercise of the police power of the State of Iowa. See Burlington & Summit Apartments v. Manolato, 233 Iowa ——, 7 N. W. 2d 26, and authorities therein cited. This court has frequently passed upon the question of whether certain legislation is a lawful exercise of police power. But no precise definition of what constitutes the police power of the state has been or can be given. In each case it is a question whether or not the collective benefit outweighs the specific restraint. Contract rights and property rights are not absolute. As Chief Justice Hughes said in Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 567, 31 S. Ct. 259, 262, 55 L. Ed. 328, 338:

"Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community."

It is true that under our form of government the use of property and the making of contracts are normally matters of private and not of public concern, but it is also true that when the

use of property or the making of contracts is tinged with public concern, then the owners of the property and the contracting parties can be subjected to reasonable regulations and prohibitions by a lawful exercise of the police power. The parties who are subjected to the regulation receive their benefit by virtue of being part of the public in whose interest the regulations are imposed. For an excellent discussion of this subject of police power, we recommend a reading of Justice Weaver's opinion in the case of the City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 1104, 184 N. W. 823, 827, 188 N. W. 921, 23 A. L. R. 1322. In this case Justice Weaver stated:

"* * * while the police power is familiarly exercised in regulations to promote the public health and morals, it extends as well to the promotion of 'public convenience and general prosperity.' Chicago, B. & Q. R. Co. v. People of Illinois, 200 U. S. 561, 592."

Again, at page 1107 of 193 Iowa, page 828 of 184 N. W., Justice Weaver quotes with approval from the case of Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923, where the Supreme Court of the United States stated that it was within the orbit of police power "to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to add to its wealth and prosperity."

For other authorities to the same effect, see Fevold v. Board of Supvrs., 202 Iowa 1019, 210 N. W. 139, and Sanford Mfg. Co. v. Western Mut. F. Ins. Co., 229 Iowa 283, 294 N. W. 406.

Bearing in mind these principles, we turn to the question of the validity of section 10161 of the 1939 Code under the police powers of this state. Again we refer to the report and recommendations of the Farm Tenancy Committee of the Iowa State Planning Board. This report stated, on pages 13 and 14:

"Iowa is the leading agricultural state in the Union. Forty per cent of her population lives on farms, deriving its income directly from farming. In addition, 20 per cent of the population lives in rural towns and villages and depends upon the income the farmers receive. The welfare of the population in Iowa, as well as of the country as a whole, is closely connected

with the welfare of the farmer. There is not a business, trade or profession in Iowa which does not suffer if the farmer suffers, or prosper if the farmer prospers. In 1929 the total income from Iowa agriculture was estimated at 451 million dollars, as compared to only 194 million dollars derived from manufacturing and 37 million dollars from banking, finance and insurance. * * *

"This committee is fully aware that not all tenure problems can be solved by legislation. Mutual cooperation, education and the development of a sense of responsibility on the part of both landlord and tenant are essential. What legislation can do, however, is to provide a framework of certain minimum standards in tenure relationships which will facilitate a clearer understanding of the rights and responsibilities of the parties concerned, and will prevent certain practices distinctly detrimental to land and community. It is the duty of the people of Iowa to accomplish the development of such standards."

Certainly such legislation as chapter 235, Acts of the Forty-eighth General Assembly, was designed to correct the evils of an ever-increasing farm-tenancy situation, to the end that the public welfare and prosperity would be promoted. Clearly it was within the power of the legislature to designate farm tenancy as a subject of police regulation. The Federal Government has recognized farm tenancy as a proper subject of federal legislation. See "Bankhead-Jones Farm Tenant Act" of 1937, chapter 517, 50 Stat. at L. 522, 7 U. S. C., section 1000 et seq. The Iowa legislature was faced with a farm-tenancy problem which, according to the survey of the State Planning Board, affected every citizen of this agricultural state. The legislation, enacted to help cure the problem, does not automatically extend the termination date of a farm lease. It provides for a four-months' notice before the tenure can be interrupted. Certainly such legislation bears a reasonable relationship to the problem.

It is quite apparent that during recent years the old concept of duties and responsibilities of the owners and operators of farm land has undergone a change. Such persons, by controlling the food source of the nation, bear a certain responsibility

to the general public. They possess a vital part of the national wealth, and legislation designed to stop waste and exploitation in the interest of the general public is within the sphere of the state's police power. Whether this legislation has accomplished, or will in the future accomplish, the desired result is not for this court to determine. The legislature evidently felt that unstable tenure leads to soil exploitation and waste. ˉ The amendment aims at security of tenure and it is therefore within the police power of the state.

 III. Section 10161 of the 1939 Code of Iowa does not impair the obligation of appellees' contract, for the law was in force for more than a year before the execution of the lease involved in this case. There is, therefore, no merit in appellees' contention that the law violates section 21, Article I of the Constitution of Iowa. If the law is a reasonable exercise of the state's police power, and we hold that it is, then the law is a part of farm leases executed after the effective date of the law. Midwest Mut. Ins. Assn. v. De Hoet, 208 Iowa 49, 222 N. W. 548; Davis v. Bronson, 6 (Clarke) Iowa 410.

 IV. The provisions of section 10161 of the 1939 Code of Iowa cannot operate to extend the lease beyond a term of 20 years within the prohibition of section 24, Article I of the Constitution of Iowa. This law extends the lease no longer than the time it would take one of the parties to terminate it. German State Bank v. Herron, 111 Iowa 25, 82 N. W. 430.

The judgment appealed from is therefore reversed.—Reversed.

GARFIELD, C. J., and HALE, MILLER, OLIVER, and MANTZ, JJ., concur.

BLISS, WENNERSTRUM, and SMITH, JJ., dissent.

BLISS, J. (dissenting)—I would affirm the judgment appealed from, and therefore respectfully dissent from the majority opinion.

Section 10161, Code, 1939, set out in that opinion, is the statutory provision which the appeal requires the court to pass upon. In the Code of 1935, section 10161 thereof consisted of

but the first sentence of the same numbered section in the 1939 Code. The section was amended to be as it appears in the latter Code, by the addition of the second and last sentence thereof, by chapter 235 (Senate File 203) of the Laws of the Forty-eighth General Assembly.

I. In ascertaining the meaning and purpose of any amendment to a statute, the legislative history of the latter is always helpful and usually necessary. In chapter 78, Code of 1851, on ''Real Property,'' will be found sections 1208 and 1209. The first provided:

''Any person in the possession of real property with the assent of the owner is presumed to be a tenant at will unless the contrary is shown.''

Section 1209 of that Code provided for the notice necessary to terminate such a tenancy. The Seventh General Assembly amended section 1209 by an act effective July 4, 1858, which is section 2218 of the Revision of 1860. The section is set out in the majority opinion and I will not repeat it here. It retained, in general, the provisions of section 1209, Code, 1851, respecting the length of the period of notice necessary to be given in order to terminate a tenancy at will, but added a new provision that if the landlord and the tenant expressly agreed upon when the tenancy at will should terminate, then no notice of termination need be given. This new portion of said section 2218 of the Revision, as set out in the majority opinion, is the following proviso at the end of the section, to wit: ''* * * provided, that where an express agreement is made, whether the same has been reduced to writing or not, the tenancy shall cease at the time agreed upon, without notice.'' Certainly this proviso must have been intended to apply only to an existing tenancy at will whose termination had been definitely fixed by an express agreement of the parties subsequent to the beginning of such tenancy. The words could apply to none other than tenancies at will since the section in which the words are found related only to such tenancies, and repealed a section which related only to tenancies at will. The notice referred to was the thirty-days' notice- to terminate such tenancies.

In the Code of 1873, section 2014 corresponded to section

1208, Code of 1851, and to section 2216 of the Revision, and changed them in no way. Section 2015, Code of 1873, made no change in section 2218 of the Revision except by adding the portion shown in italics, to wit:

"Sec. 2015. Thirty days' notice in writing is necessary to be given by either party, before he can terminate a tenancy at will; but when, in any case, a rent is reserved payable at intervals of less than thirty days, the length of notice need not be greater than such interval between the days of payment. In case of tenants occupying and cultivating farms, the notice must fix the termination of the tenancy to take place on the first day of March; *except in cases of field tenants or croppers, whose leases shall be held to expire when the crop is harvested; provided, that in case of a crop of corn it shall not be later than the first day of December, unless otherwise agreed upon.* But where an express agreement is made, whether the same has been reduced to writing or not, the tenancy shall cease at the time agreed upon, without notice." (Italics supplied.)

It appears to the writer that the last sentence of the section, which was carried over intact from section 2218 of the Revision, was intended to apply and did apply only to the classes of tenancies at will to which the section refers.

An additional section was added in the Code of 1873, and appears as section 2016, to wit:

"When such tenant cannot be found in the county, the notice above required may be given to any sub-tenant or other person in possession of the premises, or if the premises be vacant, by affixing the notice to the principal door of the building, or in some conspicuous position on the land if there be no building."

The "notice above required" can refer only to the notice to terminate a tenancy at will referred to in section 2015.

In McClain's Revised Statutes of 1888, the same three sections 2014, 2015, 2016, appear without change, respectively, as sections 3189, 3190, and 3191.

In the Code of 1897, the said three sections of the Code,

1873, and the McClain Revised Statutes were all consolidated into section 2991, without any change whatsoever in the language. The headnote of the section is "Tenant at will—notice to quit."

In the Compiled Code of 1919, section 2991 of the Code of 1897, appears without change as section 6434.

I think all will agree that all of the sections to which reference has herein been made, from section 1208 of the Code of 1851, to section 6434 of the Compiled Code, both included, pertained to tenancies at will only, and that all notices mentioned therein referred to notices to terminate such tenancies, and that the provision stating that no notice of termination need be given where there was an express agreement fixing the termination, referred to tenancies at will only. The majority opinion concedes this. But it asserts that the Fortieth General Assembly evidenced a purpose to depart from the legislative intent first declared by the Seventh General Assembly in 1858 and thereafter followed. The majority bottoms its decision in this case upon two legislative Acts—chapter 238, Fortieth General Assembly, and chapter 235, Forty-eighth General Assembly.

Insofar as that foundation is based upon said chapter 238, it clearly rests upon quicksand. It will be observed that the majority opinion states:

"The Fortieth General Assembly passed an act to 'amend, revise and codify' the entire chapter entitled 'Landlord and Tenant' as it appeared in the Compiled Code of 1919 (Acts of the Fortieth General Assembly, chapter 238). This act took the provision for termination without notice, where there was such an agreement, from the body of the general statute as it appeared in the Compiled Code, and set it forth as a separate provision, or section 6, which reads as follows:

" 'Sec. 6. Agreement for termination—effect. Where an agreement is made fixing the time of the termination of the tenancy, whether in writing or not, it shall cease at the time agreed upon, without notice.'

"Thereafter, in the Codes of 1924, 1927, 1931, and 1935, *this law*, eliminating the necessity for notice to terminate a tenancy where there was an agreement for such termination, *ap-*

*pears as a separate law,* being section 10161 in all of said Codes.''
(Italics supplied.)

The deductions of the majority, as above stated, have no support in law or in fact. One might be led to believe, from merely reading the above quotation, without further investigation, that ''the entire chapter entitled 'Landlord and Tenant,' '' covered all phases of that subject. But an examination of the chapter shows that it contained but four sections, of which the last one (section. 6434) pertained to tenancies at will, and the first three to three rather unimportant and rare phases of the subject. Just how did chapter 238 of the Fortieth General Assembly ''amend, revise and codify the entire chapter'' 5, Title XXIII of the Compiled Code of 1919? The answer is, By copying the latter chapter verbatim, without changing the text in any way whatsoever, and altering its form only by subdividing the text into seven sections instead of four, and by renumbering them, and inserting headnotes for those additional sections. This chapter had remained substantially unchanged in its language since the Code of 1873, in which the tenancy-at-will legislation was set out in three sections. In the enactment of the Code of 1897, by the Twenty-sixth General Assembly, these three sections were united in one section (2991). In the Compiled Code they were in one section (6434). Yet, it was never contended by layman or lawyer, that any of the legislative consolidations or subdivisions, or Code compilations, were intended to effect, or did effect, any change in the purpose, operation, or meaning of the statutes. The meaning and purpose of a legislative act should be determined by the language of the act, and not by the form in which it is set up, or the number of paragraphs or sections into which it may at any time be subdivided. Any such consolidation of the legislation into one section, or any subdivision into more than one section, should effect no change in the meaning or purpose of the legislation unless the legislative intention to accomplish it clearly appears.

Section 6, of chapter 238, of the Fortieth General Assembly had always been an inseparable and component part of the tenancy-at-will legislation. The majority concedes this, and yet it says that by taking that particular sentence from the body of

the text, where the Seventh General Assembly had placed it, and where it remained in the Code of 1873, McClain's Revised Statutes, the Code of 1897, and the Compiled Code of 1919, and setting it apart in section 6 of chapter 238, the Fortieth General Assembly made "*a separate law*" of this sentence, and that it continued to be "a separate law" in the Codes of 1924, 1927, 1931, and 1935, and that as such "separate law" it applied, not to tenancies at will, alone, but to tenancies having definite terms, and to leases which fixed their own termination. Such a conclusion and interpretation on the part of the majority violates a rule of statutory construction announced and followed not only by this court, but by courts everywhere. The other parts of section 6434, Compiled Code 1919, were also put into separate sections, but no one will contend, not even the majority, that they had any different meaning after their separation than they had before. But it is a matter of vital importance to the decision of the majority that section 6 of chapter 238, Acts of the Fortieth General Assembly, have a different meaning than it had in section 6434 of the Compiled Code.

This court and other courts have uniformly recognized a well-established rule of statutory construction that a mere rearrangement of statutes in a Code revision, or recodification, or the subdivision of one section into several sections, or the uniting of several sections into one section, does not change the purpose, operation, and effect thereof, unless such legislative intention so appears.

Speaking through Justice Hamilton, in a well-considered opinion, in Jones v. Mills County, 224 Iowa 1375, 1379, 1380, 279 N. W. 96, 99, the court said:

"While the law as it now appears in a separate section (6962) might be so understood, upon investigation it will be found that sections 6960, 6961, and 6962, were originally all in one section bearing the title 'Unknown or Deceased Owners', (see section 1353, Code 1897) and this meaning is traceable in all corresponding sections back to section 461, Code 1851. The law was separated into three distinct sections by the editors of the Code of 1924, but there is nothing to indicate that the leg-

islature intended to change the meaning which this court had for many years applied to this provision of the statute.

"In the case of Dennis v. School District, 166 Iowa 744, at page 750, 148 N. W. 1007, 1009, this court said:

'It is a rule of construction that changes made by a revision of the statutes will not be construed as altering the law, unless it is clear that such was the intention, and, if the revised statute is ambiguous or susceptible of two constructions, reference may be had to prior statutes for the purpose of ascertaining the intent of the legislature.'

"See, also, In re Will of Evans, 193 Iowa 1240, 1244, 188 N. W. 774; Eastwood v. Crane, 125 Iowa 707, 101 N. W. 481. The law in this state with reference to the construction of statutes that have been changed or divided into different sections by the code commissioners is in accordance with the general rule as stated in section 494, 59 C. J., page 897, as follows:

'Change in arrangement. In codifying or revising statutes, a mere rearrangement of the sections or parts of a statute or the placing of portions of what was originally a single section in separate sections does not change the purpose, operation, and effect thereof unless an intention to do so already appears.'

"See, also, State v. Gardiner, 205 Iowa 30, 215 N. W. 758."

The majority opinion very effectively, but without expressly saying so, overrules our decisions as noted in the cited cases. Of the principle stated in the Dennis case, supra, the majority opinion states:

"We agree with this rule. *It is significant here, however, that the division into a separate section was done by a specific Act of the Fortieth General Assembly.*" (Italics supplied.)

While the italicized sentence does not tell the whole truth, it would be of no avail to the majority if it did. I see no merit in the attempted distinction. What difference does it make whether the revision is by a specific and isolated act of the legislature, or by general revision accomplished by numerous specific acts? In the Dennis case, supra, the legislation construed *was a specific act of legislature,* yet it announced the rule of statutory

construction stated in the quotation from that case, and for which I contend.

The majority states that, "A tenancy at will with an agreement for a termination date is a paradox." No one will dispute this statement, and no one is disputing it. It is simply a "straw man" argument put forth by the majority "to be given a ride."

It is wholly beside the point of the case, and begs the crucial question therein. However, the majority would not, and does not, assert that an existing tenancy at will may not be terminated by an express agreement, in which case, as the legislature said, no notice terminating the tenancy at will is necessary. It appears to me that is all the legislature ever intended by the "express agreement" proviso. See Waller v. Vermitt, 97 Iowa 518, 66 N. W. 763.

I stated herein that the statement of the majority that chapter 238 was "a specific act" of the Fortieth General Assembly was not the whole truth. It is true that it appears as such an act on pages 238 and 239 of the bound volume of the Laws of the Fortieth General Assembly, but it will also be observed, by turning to page 205 of the same volume and to pages 447 and 448 of the index to the volume, that chapter 238, House File 80, was one of fifty-four other "Code Revision Acts" drawn by the Code Commissioners, but accepted and adopted by the Fortieth General Assembly. This particular act, chapter 238, House File 80, was not drawn by that General Assembly or any member thereof, but it was "Code Commissioners' Bill No. 80, prepared by the Honorable J. C. Mabry, one of the Commissioners. (See Report of Code Commission, 919, where the bill is set out. See, also, the Supplement to the Code Commission's Report, published in March 1922, which shows on page 246 thereof that no amendment was made to the original "Code Commissioners' Bill No. 80—subject: Landlord and Tenant.)"

I call attention also to the volume entitled "Briefs of Code Commission Bills," published by the Code Editor, in June 1922. On page 189 thereof appears the "brief" of the bill which became chapter 238 of the Fortieth General Assembly. It is so blocked out that it is difficult to set out with a typewriter, but I will note the material portions, to wit:

"Brief of Code Commissioners' Bill No. 80.
Prepared by J. C. Mabry
Subject: Landlord and Tenant
General Explanation
Purely a Codification Measure by Rearranging and Dividing Sections for Clearer Statement and More Logical Order. No Change in the Law Proposed." (Capitals supplied.)

The "brief" then sets out just how the four sections of chapter 5, Title XXIII of the Compiled Code of 1919, sections 6431, 6432, 6433, 6434, were made into seven sections, by dividing section 6434 into four sections, just as the chapter was subdivided in chapter 238, Fortieth General Assembly.

It cannot be overlooked that the capitalized words conclusively refute the contention of the majority respecting the change in the meaning of section 6434, Compiled Code 1919, effected by its division into new sections, thereby enacting section 6 into "a separate law."

The members of the Fortieth General Assembly, of course, knew of the Code Commissioners' Bill No. 80, and of the manner in which and by whom it was drawn and subdivided, and knew of the book of "briefs" and the contents of page 189 thereof, because the Thirty-ninth General Assembly, by chapter 333 of its laws, authorized the Committee on Retrenchment and Reform to call upon the former Code Commissioners, Trewin, Mabry, and Whitney, to assist them in carrying out the provisions for Code revision. Such knowledge also appears from the preface in the book of "briefs" wherein it is stated:

"The Committee [retrenchment and reform], after a conference with the former Code Commissioners, came to the conclusion that it would be a real economy to have such explanatory notes or statements prepared for each of the code revision bills as would be helpful to the legislature in the work of Code revision."

I think it makes no difference in the construction of an amending act whether it be "a specific act" of the legislature or an act passed in the general course of Code revision, as the rule of statutory construction is the same in either case. The

majority seems to think otherwise, but admits that the rule stated in the Dennis case, and Mills County case, supra, applies to changes made by a revision of the statutes. It clearly appears that the statutory subdivision in this case was made in a revision of the Code.

I think it must be conceded that section 10161, of the Code of 1935, applied only to agreements to terminate tenancies at will, without regard to whether the property under lease was agricultural or nonagricultural real estate, and that it had no application to tenancies of definite duration, or to leases which by their own provisions fixed their terminations.

But the majority contends that such a construction is incorrect. It argues that section 10161, Code, 1935, "stems from the specific act of the Fortieth General Assembly (section 6, chapter 238, Acts of the Fortieth General Assembly)." It also asserts:

"The argument that this section only applied to tenancies at will is weakened by an analysis of the effect of such a limited application. The law deals with agreements for termination of tenancies. A tenancy at will negatives any such agreement for termination. A tenancy at will with an agreement for a termination date is a paradox. If there is an agreement for a termination of the tenancy, then it is a tenancy for a term and not a tenancy at will."

I have already mentioned the speciousness of this argument. It may be further observed that a reasonable interpretation of the quoted language is that section 10161, Code of 1935, did not apply to tenancies at will but applied only to leases which in themselves fixed their termination.

If there be any doubts as to what this section of the Code of 1935 meant, the majority argues that they were "all cleared up by the passage of chapter 235, Acts of the Forty-Eighth General Assembly," entitled an act to amend section 10161, Code, 1935 "relating to the termination of *agricultural leases.*" The majority opinion continues: "Here is a legislative interpretation of section 10161 as it stood in the Code of 1935." The section needed no such interpretation to determine that the section, and all its antecessors in the preceding Codes, "related

to the termination of agricultural leases." Not agricultural leases, *as a whole,* but "agricultural leases," and agricultural tenancies of an indefinite duration—tenancies-at-will of agricultural lands. That is what section 10161 of the Code of 1935 meant and that is what its single sentence meant in every one of its corresponding predecessor sections. This sentence, in all of those sections, applied to and included leases and tenancies of both nonagricultural and agricultural lands.

Since that was the meaning of section 10161, Code, 1935, and since it was placed in section 10161 of the Code of 1939, wholly unchanged, it has the same meaning in that section as it had in the first-mentioned section. Such is the general rule of statutory construction. In 59 C. J. 1096, 1097, section 647, it is said:

"Where an amendment leaves certain portions of the original act unchanged, such portions are continued in force, with the same meaning and effect they had before the amendment."

See, also, Thompson v. Mossburg, 193 Ind. 566, 139 N. E. 307, 310, 141 N. E. 241.

Since the single sentence comprising section 10161, Code of 1935, had always been intended to apply to tenancies at will, and had always been so considered and construed, it should be concluded that it had the same meaning in the same-numbered section in the Code of 1939. It is also a logical and reasonable conclusion that when the Forty-eighth General Assembly amended section 10161, Code, 1935, by transposing it bodily into section 10161, Code *1939,* and adding a second sentence to the latter section, it intended to limit the meaning and purpose of the amendment and addition, *solely to the subject matter of the first sentence,* or to some part thereof, i. e., to tenancies at will affecting agricultural lands of the character specified in the amendment. Let us look at this amendatory addition. Immediately after the first sentence of the section, it states:

"In the case of farm tenants, except mere croppers, occupying and cultivating an acreage of forty acres or more, the tenancy shall continue for the following crop year upon the same

terms and conditions as the original lease unless written notice for termination is given by either party to the other not later than November 1, whereupon the tenancy shall terminate March 1 following; * * *.''

If this sentence is limited to farm tenancies at will, it may not only be reconciled with the plain meaning of the first sentence but it remedies an economic evil of long standing, namely, that prior to this amendment either the landlord or the tenant at will of farm lands could wait until thirty days before March 1st before giving notice of the termination of the tenancy at will, at which date the owner had difficulty in getting a tenant, suitable or otherwise, and the tenant had the same difficulty in securing a suitable farm, or perhaps any farm. If the amendment be applied to farm tenancies at will, requiring notices to terminate such tenancies to be given before November 1st, this evil is in large part remedied. Such a construction of the amendment is not only in accord with the recognized rules of statutory construction, but it also accords with common sense, and remedies a patent evil. It is certainly proper to consider all of these factors in seeking the intention of the legislature.

The majority argues that the amendment applies only to farm leases of definite terms. It states:

''It seems clear that, by this amendment, the legislature intended to include term leases. *The effect is to leave the law allowing termination without notice applicable to urban leases and all leases other than farm leases*, but in the case of farm leases, except those conveying cropper rights and those conveying less than 40 acres, the notice by November 1st must be given.'' (Italics supplied.)

To put it more concretely, the majority contends that since the amendment, the first sentence of section 10161, Code, 1939, applies only to nonagricultural tenancies at will, and to cropping arrangements, and to field tenancies of less than 40 acres, but not to farm tenancies at will of more than 40 acres. In other words, the tenant at will of a business house, or a residence, in a village, town, or city, and his landlord, may by express agreement terminate that tenancy at will at any time, but the owner of a

farm of·more than 40 acres, and his tenant at will, after November 1st, are deprived of this right, and cannot then by agreement terminate that tenancy at will. And why does the majority say they cannot? Because the Forty-eighth General Assembly, by chapter 235 of the Acts, said that such an agreement was detrimental to the welfare of the great State of Iowa, and would tend to the ruthless exploitation of the fertility of its rich black soil.

It contends that such was the clear legislative intent. And it refers to the report and recommendations of the Farm Tenancy Committee of the Iowa State Planning Board. The abstract of the record does not show that such a report was ever known to the trial court. I have no doubt that it was the thought of this committee and board, that, as indicated in paragraph 6 of its report, all farm leases should continue automatically if no notice of termination was served six months before the expiration date of the lease. But I am not at all convinced that the legislature so intended by chapter 235 of the Laws of the Forty-eighth General Assembly. A reading of the record of this bill in the senate journal indicates much doubt in the matter. The senate seemed to have a rather indefinite idea of the purpose and effect of the bill. One of the various amendments proposed expressly made it applicable only to tenancies at will. The majority says this amendment was not adopted, but if the statement was meant to convey the impression that it was voted down, it is contrary to my recollection of the record, which I do not have before me. My recollection is that no action was taken on this proposed amendment, and that this was true of other amendments. One of these was to repeal both sections 10160 and 10161.

With respect to the contention of the majority that the agreement to terminate a tenancy and thus dispense with giving any notice of termination, we call attention to the fact that in Crittenden v. Jensen, 231 Iowa 445, 1 N. W. 2d.669, we held that the November 1st notice was not necessary when the parties had agreed upon a termination of the tenancy prior to its expiration date. In Smith v. Coutant, 232 Iowa 887, 6 N. W. 2d 421, we held that a tenant under a written lease could estop

himself by his acts from being entitled to the November 1st notice. In view of these decisions, is there any sound or legal reason why a tenant at will, of a farm in excess of 40 acres, and his landlord, cannot agree at any time to terminate such tenancy? And if they can make such an agreement after the lease is entered into, and the tenancy has progressed for a number of months, why cannot such an agreement be embodied in the lease at the very time the contract is made, with the same force and effect? Why, after the parties have fixed the expiration date in the lease at the time of its execution, should they have the burden placed upon them of serving a four-months' notice of termination in order to accomplish the exact results the parties had originally agreed to in their lease? And what is accomplished by it, and how is the tenure lengthened by such foolish procedure? It just does not make sense, and for that reason I cannot conceive of the legislature's intending to require it. One may conceive of many reasons and circumstances where it would be impossible, or to the great disadvantage of one or both such parties to continue under such a lease. Yet, as I have noted, the majority opinion in one place, states that this right to terminate a tenancy without notice applies only to urban leases, or to agricultural leases covering less than 40 acres.

The majority also states:

"* * * we are thoroughly convinced that the legislative intent of the Forty-eighth General Assembly at the time of the enactment of chapter 235 was that farm leases for a definite term could be terminated only by the November 1st notice, and failure to give the notice worked a renewal of the lease for one year commencing the next March 1st."

In other words, it is the view of the majority that the legislature thought it was necessary for the general welfare of Iowa that all farm leases covering in excess of 40 acres, having definite terms, require the November 1st notice to terminate them, and cannot be terminated by agreement, while farm tenancies at will, covering in excess of 40 acres, are not within the purview of the amendment, and can be terminated by agreement, or by a notice of termination served not less than 30 days before March 1st.

I am reluctant to believe that any Iowa Legislature ever intended to interfere with the rights of any farm owner or any farm tenant to decide for themselves on which "March 1st" their tenancy relations shall terminate. Or to say to the one, we shall select where you shall labor, and to the other, we will choose who shall operate your farm for the following farming year, even though you two have agreed otherwise. I fully appreciate that it is not for a court to legislate, or to pass upon the propriety, wisdom, or efficacy of legislative action, but a court or a member thereof may properly discuss these factors in seeking legislative intent or in passing upon the constitutionality of legislation. I also agree with the majority that the liberty to contract, like all of our liberties, is not unlimited, but I have an abiding conviction that there is much more to our Constitutions than the general-welfare clauses.

Both legislatures and courts should be very cautious and circumspect and most reluctant to interfere with the inherent right of the individual to contract as he pleases with respect to both his property and his labor. Such interference should never be attempted except for the most urgent and impelling reasons, and when war, or other great emergencies, or public requirement, demand it. There should also be most reasonable probability that the interfering legislation will remedy the evil, or effect the beneficial result which is sought. There must be a reasonable relation between the legislative means and the legislative object.

The majority opinion quotes the committee report that tenant-operated farms increased from twenty-four per cent in 1880 to fifty per cent in 1935, and that in 1937, fifty-eight per cent of the farm area was under lease. Will anyone seriously contend that this condition has been brought about because landowners and tenants have always been accorded the right to determine the duration of their tenancies, or that there is the slightest likelihood that the construction which the majority has placed upon the amendment will cause an exodus of farm owners back to the soil?

No facts or reasons have been advanced that the amendment, as construed by the majority, has any reasonable probability of effecting the results allegedly sought.

It is hardly conceivable that the legislature had any thought of attempting to interfere with the rights of either any farm owner or any farm tenant to make such contract provisions as they might deem proper in definitely fixing the termination of a lease. It is an inalienable and inherent right of every man and woman, if competent, and the contract is lawful and not clearly and palpably against public policy and the public welfare, to deal with and make contracts affecting their property and right to labor as they see fit. Such rights are recognized and safeguarded by provisions of both the state and United States Constitutions. Legislators and courts have always been, and should be, most reluctant to interfere with those rights unless the public need be most urgent and impelling. If such need exists, the means adopted to remedy the evil or to effect the beneficent purpose must be reasonably effective to accomplish the end. The appellant contends that the well-being of agriculture is of vital concern to the people of the state. No one will contend otherwise. The contention is also made that farm owners and farm tenants should, by the expenditure of money and labor in repairs and by efficient methods of farming, increase and conserve the productivity of the soil. Everyone will agree to this. But, beyond the mere assertion of these conceded facts, and solely by argument, and without any factual basis in the record, appellant offered no sound reasons or reasonable probability that the construction put by the appellant on the amendment will accomplish these desired ends. It is urged that the frequent changes and the excessive turnover in tenants are not conducive to obtaining better farming. No one will seriously disagree with the assertion that leaseholds of more extended duration are ordinarily beneficial to both the landowner and the tenant. But just how would the construction which appellant and the majority of the court place on the amendment bring this result about? If the notice is served as provided by the amendment, the tenancy will terminate at the end of the farm year on March 1st. If the notice is not served, then the tenancy is continued for another year, but neither the owner nor the tenant will have any assurance that it will be extended any further until November 1st of that year. So that in either event, neither the owner nor the tenant may ever be sure that the tenancy relations

between them will have over a year's duration. Appellant urges that the purpose of the amendment will be to encourage the "tenant to put his own money and labor into a farm." We are unable to see how the amendment, under the appellant's construction, will give such encouragement to a tenant.

I am not satisfied that the legislation, under the construction put upon it by the majority, is a proper and legitimate exercise of the police power of the state. In support of this view see 16 C. J. S. 562, section 195, to wit:

"Necessarily for public good. In order that a statute may be sustained as an exercise of the police power, the courts must be able to see that the enactment has for its object the prevention of some offense or manifest evil or the preservation of the public health, safety, morals, or general welfare, that there is some clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof, and that the latter do in some plain, appreciable, and appropriate manner tend toward the accomplishment of the object for which the power is exercised."

The construction which the majority puts upon chapter 235 of the Forty-eighth General Assembly places the great farming industry of the state of Iowa in the same category as those industries which are affected with a public interest to such an extent that the operation of the farms of the state and the conduct of the state's greatest industry is subject to governmental control in its various details. There may come a time when the farming industry shall be put in the class of railroads, banks, insurance companies, public utilities, etc., requiring strict governmental supervision, but I am not willing to say to the farmers of Iowa that the day has arrived. If the government, as represented by its General Assembly, can interfere with the freedom of contract of the landowner and his tenant respecting the duration or termination of their lease or tenancy arrangements, then it can also direct how the farming operations shall be conducted. I am not willing to go so far. I am abidingly convinced that the Forty-eighth General Assembly never intended to so infringe upon these fundamental rights of either the farm owner or the farm tenant. I am re-

minded of the words of Thomas Jefferson—"Were we directed from Washington when to sow and when to reap, we should soon want bread."

II. The majority states that chapter 235, Acts of the Forty-eighth General Assembly, does not impair the obligation of appellees' contract because the law was in force before the execution of the lease. I see no merit in this position. A statute which violates the constitutional right of a litigant is of no force or effect with respect to a contract entered into prior to the enactment of the statute, and likewise, it is of no force and effect with respect to his right to enter into future contracts. An unconstitutional statute is never a part of any contract subsequently entered into.

III. It is my opinion that if the amendment be applied only to tenancies at will of farm lands of the designated acreage —and most tenancies are holdovers after fixed terms have expired—the amendment is constitutional. But as interpreted by the majority, I gravely question its constitutionality.

I would affirm the trial court.

WENNERSTRUM and SMITH, JJ., join in this dissent.